## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. _____

UNITED STATES OF AMERICA,

v.

JUAN RAMON MOLINA RODRIGUEZ,

**Defendant.**

_____/

### FACTUAL PROFFER

The United States of America (the "United States") and JUAN RAMON MOLINA RODRIGUEZ (the "defendant" or "MOLINA RODRIGUEZ"), stipulate and agree that the information stated herein is true and accurate and a sufficient basis for the defendant's plea of guilty to the money laundering conspiracy in violation of Title 18, United States Code, Section 1956(h), charged in the instant case and the forfeiture of the assets identified in the Information. Had this matter proceeded to trial, the defendant stipulates and agrees that the government would have proven the facts set forth below beyond a reasonable doubt and the forfeiture allegations set forth in the Information by a preponderance of the evidence.

#### A. Background

1.      Between in or around 2015 and at least 2020, Comité Técnico del Fideicomiso para la Administración del Fondo de Protección y Seguridad Poblacional ("TASA") was a Honduran government agency responsible for procuring uniforms and other materials for, inter alia, the Honduran National Police. Pursuant to Honduran law, TASA collected special taxes and used the money to fund procurement activities related to law enforcement and the military. TASA was controlled by the government of Honduras and performed a function that Honduras

treated as its own, and was a "department, agency, or instrumentality" of the Honduran government as those terms are used in the Foreign Corrupt Practices Act ("FCPA"), Title 15, United States Code, Section 78dd-2(h)(2)(A).

2.      During the relevant period, MOLINA RODRIGUEZ was a citizen of Honduras and a Titular Director at TASA. MOLINA RODRIGUEZ was a "foreign official" as that term is defined in the FCPA, Title 15, United States Code, Section 78dd-2(h)(2)(A).

3.      "Offshore Front Company 1" was a front company incorporated outside the United States and controlled by MOLINA RODRIGUEZ. MOLINA RODRIGUEZ used a bank account ending in 1951 in the name of Offshore Front Company 1 ("Offshore Front Company 1 Account 1951") at a bank in Belize to receive and conceal bribe payments.

4.      FRANCISCO ROBERTO COSENZA CENTENO ("COSENZA") was a citizen of Honduras and a senior official at TASA, where he reported to MOLINA RODRIGUEZ. COSENZA was a "foreign official" as that term is defined in the FCPA, Title 15, United States Code, Section 78dd-2(h)(2)(A).  COSENZA controlled multiple companies and accounts in Central America and the United States that were used to receive and conceal bribe payments.

5.      "Georgia Company 1," a limited liability company headquartered in Marietta, Georgia, owned and operated a factory in Honduras that manufactured law enforcement uniforms. Georgia Company 1 was a "domestic concern" as that term is defined in the FCPA, Title 15, United States Code, Section 78dd-2(h)(1)(B).

6.      CARL ALAN ZAGLIN ("ZAGLIN"), a citizen of the United States and a senior executive of Georgia Company 1, was a "domestic concern," an "officer, director, employee, and agent" of a "domestic concern," and a "stockholder" acting on behalf of a "domestic concern," as

those terms are used in the FCPA, Title 15, United States Code, Sections 78dd-2(a) and 78dd-2(h)(1).

7.     "Executive 2," a citizen of the United States and a senior executive of Georgia Company 1, was a "domestic concern," an "officer, director, employee, and agent" of a "domestic concern," and a "stockholder" acting on behalf of a "domestic concern," as those terms are used in the FCPA, Title 15, United States Code, Sections 78dd-2(a) and 78dd-2(h)(1).

8.     LUIS BERKMAN ("L. BERKMAN"), a dual citizen of the United States and Bolivia and a senior executive at Georgia Company 1, was a close relative of BRYAN BERKMAN and related by marriage to ALDO NESTOR MARCHENA. L. BERKMAN was a "domestic concern" and an "employee" and "agent" of a "domestic concern," as those terms are used in the FCPA, Title 15, United States Code, Sections 78dd-2(a) and 78dd-2(h)(1).

9.     BRYAN BERKMAN ("B. BERKMAN"), a dual citizen of the United States and Bolivia and a resident of Broward County in the Southern District of Florida, during part of the scheme was an "employee" and "agent" of Georgia Company 1 and during its entirety was a "domestic concern" and an "employee" and "agent" of a "domestic concern," as those terms are used in the FCPA, Title 15, United States Code, Sections 78dd-2(a) and 78dd-2(h)(1).

10.    ALDO NESTOR MARCHENA ("MARCHENA"), a dual citizen of the United States and Peru and a resident of Palm Beach County in the Southern District of Florida, was a "domestic concern" and a "director, employee and agent" of a "domestic concern" as those terms are used in the FCPA, Title 15, United States Code, Sections 78dd-2(a) and 78dd-2(h)(1).

11.    MARCHENA controlled a series of entities incorporated in Florida with listed addresses in the Southern District of Florida, including "Florida Company 1," which was a

3

"domestic concern" as that term is used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(1)(B).

### B. Overview of the Scheme to Launder Bribery Proceeds

12.     Beginning in or around March 2015 and continuing until in or about November 2019, ZAGLIN, Executive 2, L. BERKMAN, B. BERKMAN, and MARCHENA, together with others, agreed to pay, and did pay, bribes to Honduran government officials, including MOLINA RODRIGUEZ and COSENZA, in violation of U.S. and Honduran law, including the FCPA.  In exchange for the bribes, MOLINA RODRIGUEZ, COSENZA, and other Honduran government officials assisted Georgia Company 1 in obtaining contracts with, and securing payment from, TASA.  The contracts were worth over approximately $10 million and for the sale of uniforms and accessories for the Honduran National Police.  ZAGLIN, Executive 2, L. BERKMAN, B. BERKMAN, and MARCHENA used the proceeds of the contracts to make the bribe payments.

13.     In or around September 2015, while the scheme was underway, ZAGLIN, L. BERKMAN, and others recruited MARCHENA into the conspiracy to assist with laundering the bribe payments.  ZAGLIN, MARCHENA, and others created and executed sham contracts and fraudulent invoices to conceal the scheme and launder over approximately $2 million through MARCHENA.  MARCHENA and his co-conspirators used the funds to make bribe payments to MOLINA RODRIGUEZ, COSENZA, and other Honduran government officials.

14.     To launder the bribe payments, ZAGLIN, Executive 2, L. BERKMAN, B. BERKMAN, MARCHENA, MOLINA RODRIGUEZ, COSENZA, and others agreed to (i) send money from the Central Bank of Honduras in Honduras through and to bank accounts in the United States, including accounts located in the Southern District of Florida; and (ii) send money

4

from bank accounts in the Southern District of Florida through and to bank accounts outside the United States, including in Belize.

15.     As described in greater detail below, MOLINA RODRIGUEZ agreed with COSENZA to receive and share at least approximately $248,000 from Georgia Company 1, ZAGLIN, Executive 2, L. BERKMAN, B. BERKMAN, and MARCHENA as bribe payments. MOLINA RODRIGUEZ personally received approximately $114,000. MOLINA RODRIGUEZ and COSENZA received the bribes in exchange for using their official positions to assist Georgia Company 1 to obtain and retain business with, and receive payment from, the Honduran government.

16.     In furtherance of the scheme, funds were wired from an account controlled by MARCHENA in the United States to Offshore Front Company 1 Account 1951 in Belize, which was controlled by MOLINA RODRIGUEZ. The transfers occurred soon after MARCHENA received contract proceeds from Georgia Company 1.

### C. The First Uniform Contract

17.     Beginning in or around March 2015, ZAGLIN, Executive 2, L. BERKMAN, B. BERKMAN, and others sought to win a contract from TASA worth approximately $4.8 million for Georgia Company 1 to sell uniforms and accessories to TASA for the Honduran National Police.

18.     On or about June 25, 2015, Executive 2, on behalf of Georgia Company 1, executed a contract with TASA whereby Georgia Company 1 agreed to provide the Honduran National Police with uniforms and accessories in return for approximately $4.8 million (the "First Uniform Contract"). MOLINA RODRIGUEZ, as a legal representative of TASA, signed the First Uniform Contract on behalf of TASA.

5

19.     The conspirators needed a financier to transfer approximately 20 percent of the contract's proceeds to government officials as kickbacks. On or about September 8, 2015, ZAGLIN met with L. BERKMAN and MARCHENA at MARCHENA's office in Miami, Florida, in the Southern District of Florida, to discuss laundering the proceeds of the First Uniform Contract as bribe payments to Honduran government officials.

20.     On or about October 6, 2015, ZAGLIN, on behalf of Georgia Company 1, and MARCHENA, on behalf of Florida Company 1, executed a "Brokerage Agreement." The Brokerage Agreement required Georgia Company 1 to pay Florida Company 1 25.4 percent of the proceeds Georgia Company 1 received from TASA under the First Uniform Contract. Approximately five percent of the fee was compensation MARCHENA received for laundering the bribe proceeds.

21.     From July 31, 2015, through February 16, 2016, the Central Bank of Honduras made six payments to Georgia Company 1's bank account at U.S. Bank 1 ending in 6772 (the "Georgia Company 1 Account 6772") totaling approximately $4,960,703.66. At certain points in time, L. BERKMAN emailed COSENZA at COSENZA's TASA email address to inquire about when Georgia Company 1 would be paid.

22.     On or about January 13, 2016, ZAGLIN emailed a series of invoices to MARCHENA and wrote that Georgia Company 1 "will be paying commissions" on the invoices. ZAGLIN asked MARCHENA to "prepare a commissions invoice for me" based on the invoices.

23.     Later that day, MARCHENA sent several Florida Company 1 invoices to ZAGLIN. MARCHENA's invoiced amount equaled approximately 25.4 percent of ZAGLIN's invoiced amount. On or about January 13 and 14, 2016, Georgia Company 1 paid Florida

6

Company 1 pursuant to the invoices.  Georgia Company 1 sent two wire transfers to accounts controlled by MARCHENA located in the Southern District of Florida.

24.     In total, between on or about January 13, 2016, and on or about March 11, 2016, Georgia Company 1 sent Florida Company 1 four wire transfers totaling approximately $1,260,018.70, approximately 25.4% of the total Georgia Company 1 received from TASA.

### D. The Second Uniform Contract

25.     On or about October 26, 2016, Executive 2, on behalf of Georgia Company 1, executed a second contract with TASA pursuant to which Georgia Company 1 agreed to provide the Honduran National Police with uniforms and accessories in return for over approximately $5.6 million (the "Second Uniform Contract").  MOLINA RODRIGUEZ signed the Second Uniform Contract on behalf of TASA.

26.     From on or about November 28, 2016, through on or about August 25, 2017, Georgia Company 1 received seven wires from the Central Bank of Honduras totaling approximately $5,695,774.74.

27.     On or about February 7, 2017, MARCHENA and ZAGLIN executed a second "Brokerage Agreement" between Florida Company 1 and Georgia Company 1 (the "Second Brokerage Agreement").  The Second Brokerage Agreement was backdated to October 26, 2016, the date of the Second Uniform Contract.  Under the Second Brokerage Agreement, the fee Georgia Company 1 agreed to pay to Florida Company 1 was reduced from 25.4% to 21%.

28.     Between on or about February 9, 2017, and on or about August 30, 2017, Georgia Company 1 sent to accounts controlled by MARCHENA six wire transfers totaling approximately $1,196,112.69, approximately 21 percent of the proceeds it received under the contract.  The accounts were opened and maintained in the Southern District of Florida.

### E. MOLINA RODRIGUEZ Receives $114,000 into Offshore Front Company Account 1951

29.     MOLINA RODRIGUEZ controlled Offshore Front Company 1 Account 1951.

30.     MARCHENA, using the proceeds of the Second Uniform Contract, sent three wire transfers totaling approximately $114,000 to Offshore Front Company 1 Account 1951. Specifically:

        a.  On February 16, 2017, MARCHENA transferred approximately $50,000 from Florida Company 1 Account 7803 to Offshore Front Company 1 Account 1951.

        b.  On April 10, 2017, MARCHENA transferred approximately $50,000 from Florida Company 1 Account 7803 to Offshore Front Company 1 Account 1951.

        c.  On May 18, 2017, MARCHENA transferred approximately $14,000 from Florida Company 1 Account 7803 to Offshore Front Company 1 Account 1951.

### F. The 2019 Corrupt Bid

31.     In or around late 2019, Georgia Company 1 and a consortium of manufacturers sought to bid on a large contract with TASA for the procurement of various goods.  Georgia Company 1's portion of the contract was to be worth approximately $7.5 million.

32.     On or about October 10, 2019, L. BERKMAN spoke to ZAGLIN and Executive 2 and explained that he had previously spoken with COSENZA to confirm the bribe money to be paid for the proposed contract.  MOLINA RODRIGUEZ was present for L. BERKMAN's conversation with COSENZA.

33.     In one conversation, L. BERKMAN, Executive 2, and ZAGLIN discussed the bribery scheme for the 2019 contract by referring to a "waterfall" and "commission" on the proposed contract. L. BERKMAN said that he talked to "[COSENZA] and, uh, [MOLINA RODRIGUEZ] was there . . . about, you know, the waterfall."

34.     In another conversation, L. BERKMAN told ZAGLIN, "[I]t's going to be covered in all that 20 [percent bribe] . . . So I just told them it's done – done. I said, 'You can assure – you can assure [another senior Honduran official] and everybody that we're on the same page with the waterfall and everything.'" ZAGLIN responded, "Yep, yep."

35.     On or about November 6, 2019, Executive 2 emailed Georgia Company 1's approximately $7.5 million bid for the proposed contract to a consultant. The consultant's email signature block listed an address in Port Saint Lucie, Florida. Georgia Company 1 did not ultimately secure the proposed contract with TASA.

**G. Additional Payments**

36.     The defendant also received additional bribes involving government contracts involving TASA. Between 2015 and 2022, the defendant directly obtained additional bribe payments totaling at least hundreds of thousands of dollars.

37.     During all relevant times, with regards to the bribe payments, the defendant knew that he was participating in an illegal bribery and money laundering conspiracy and that the funds he sought to transact in were the proceeds of criminal activity.

* * *

## H. Conclusion

The preceding statement is a summary made for the purpose of providing the Court with a factual basis for the defendant's guilty plea to the charge against him. It does not include all the facts known to the defendant or the United States concerning criminal activity in which the defendant and others engaged. The defendant makes this statement knowingly and voluntarily and because he is in fact guilty of the crime charged.

GLENN S. LEON
CHIEF, FRAUD SECTION
CRIMINAL DIVISION
U.S. DEPARTMENT OF JUSTICE

BY: _____
    PETER L. COOCH
    ANTHONY SCARPELLI
    SHY JACKSON
    TRIAL ATTORNEYS

Date: 7/10/2024

Date: 7/10/2024

MARKENZY LAPOINTE
UNITED STATES ATTORNEY
SOUTHERN DISTRICT OF FLORIDA

BY: _____
    ELI S. RUBIN
    ASSISTANT UNITED STATES ATTORNEY

By: _____
    SILVIA PIÑERA-VÁSQUEZ
    ATTORNEY FOR DEFENDANT

By: _____
    JUAN RAMON MOLINA RODRIGUEZ
    DEFENDANT